Okay, we're happy to hear argument in our second case, United States v. No. 17. Your Honor, good morning. My name is Gerald Ruder. I am representing Mr. Mejia-Ramos in this appeal. Your Honor, this is an appeal from a MS-13 prosecution where the primary overt act, which we have identified in our brief, deals with the unfortunate murder of one Ms. Ingrid Martinez. And our issues, of course, deal exclusively with evidentiary rulings made by the district court. And I fully recognize, Your Honor, that when it comes to matters of evidence, that it's a pretty high bar. You all have to find there's an abuse of discretion. And beyond that, you have to find, in fact, that any abuse of discretion was not harmless error, nor if there be any action to be taken in my attempt to reverse this conviction. It's my opinion, based upon the record here, which shows that the only evidence against Mr. Ramos was all circumstantial, no direct evidence at all. What was shown to the jury primarily were these three cooperator members of MS-13. Two of the three attempted through the government to testify as to what it was that Mr. Ramos had told them, if anything, about the death of Ms. Martinez. And it's those three witnesses I want to focus on today. I believe that, cumulatively, this court should find that there was an abuse of discretion, especially given the fact that there's no direct evidence at all that Mr. Ramos was responsible for this death. It's one thing, Your Honor, when there's a lot of direct other evidence to hook someone to a particular crime. That's not the case here. So, first of all... I thought evidence was evidence. Well, of course it is. There's direct evidence, and there's circumstantial evidence, and there are a lot of people doing a lot of time on circumstantial evidence. There's no question about that. Absolutely none at all, Judge King. Circumstantial evidence is very good evidence. There's no question about that. I question here on three separate occasions the meat of the government's case and the rulings that His Honor, Judge Titus, had made at the time. Looking first at Mr. Prada-Ramirez. Mr. Ramirez was asked about a discussion that he had had with Mr. Ramos at a given time, and he had said in his direct examination that, and this is a quote actually, a quote, he said that girl was taken by the beast. He said that girl was a cheval. The question that followed was, and how did you interpret that? And his answer was, I understood him to be saying that he had killed her. On cross-examination, this is in the appendix at page 337. So there was no objection to that question and answer, right? There was not, Judge Diaz. And quite frankly, it's my belief, I hope that I'm correct in this, it's probably appropriate to ask that kind of a question as to what your understanding was, and I know what you're getting at. I objected to it when it came back on redirect, but I did so on the theory that the witness had been surrendered at that point, and there was all kinds of mix-up, and Judge Titus should not have permitted this. Well, I mean, I think the district court has ample discretion to reopen direct and cross. I mean, if that's your objection, I don't know that that's a winner. Well, Your Honor, it may not be a winner, but nonetheless, under Rule 611, clearly the court has all kinds of discretion. I thought, frankly, the better objection, but what was the foundation and basis for him to give anyone's understanding of what that statement meant? It just seemed to me to be some speculation. Well, that was the subsequent, when I made the objection the second time around, that was precisely. And I'm not being critical. I mean, in the middle of a trial, obviously these things come at you quickly, and you sort of have to think on your feet, but in retrospect, that seemed to me the better argument is that what does it matter but his understanding of what someone else was thinking? And if you recall, Your Honor, that's precisely the objection I made during the redirect, in addition to the fact that he'd surrendered the witness. Your point, however, is well taken. There probably should have been an objection at this point in the proceedings. But I asked this question, Your Honor, on cross. I said, this is at page 357, quote, Mr. Ramos did not tell you that he killed anybody, did he? The answer was, well, as I said, the only thing he told me was the beast had taken the girl called Ingrid. And my cross-examination went on into the next day, and I never addressed that issue again at all. He was then surrendered as a witness, and then the government did its redirect, and the last question that was asked on redirect, this is page 398 of the appendix, had to do with the government revisiting what they had asked him on direct examination. I objected to that, and what happened was this. An answer was given by Mr. Ramirez. He said, and I quote, that she had been killed and that she had been given to the beast, to the devil. Well, he's still answering this question, government counsel then says, by who? He then continues to attempt to answer the first question posed by government counsel by saying, and also, which is proof he's simply trying to continue his answer of the first question. He says, and also because he told me she was a Chevala, and between MS and Chevala is the only result, can be death. Chevala was a snitch, is that right? Chevala, Your Honor, quite frankly, is just a derogatory term for a person who may be a member of a different gang. Different gang. Yes, Your Honor. Can it be a snitch? Yes. Can it be a snitch too? It can be a snitch. And he was like the interpreter. Well. That's what it was. Mr. Ramirez. They're speaking a different language, the street language. That's correct. And you've got a witness up there that's translating for you. Yes. And the transcript does show, Judge King, I know you've seen it, there were endless pages of testimony by all three of these gentlemen about what is MS-13, where does it come from, how does it work, terminology, rankings, and so on, which has been found by this court and others to be proper examination for a jury to understand what the enterprise is all about. Somebody's got to explain to the jury what these terms mean. Yes.  I mean, this is up there in Greenbelt, right, and there's not many. This is in Baltimore. This is in Baltimore, yeah. It was. Your Honor, I apologize. It was Greenbelt. But not everybody's going to understand that's on a jury what this kind of talk is. Right. The Beast. What's the Beast? The Cheval. What's the Cheval? Yes. And that, in fact, was. That's another gang member. That's a snitch. That's somebody that's against them. That's right. That was all explained, and we don't take issue with that. That is proper direct examination, we believe. The Beast is the devil. The Beast is the devil. And the members indicate that they serve the devil, not God. Now, after that witness was surrendered by the government, evidently one of the translators said, oh, Your Honor, I think there was a mistake in translation as to something that I had asked on cross-examination, going now back to cross-examination. And we had a bench conference. I stood up. I tried to resolve the issue. It was resolved very short. That was the end of it. And then the government says, oh, Your Honor, I want to fix something, too. I want to ask Mr. Ramirez another question, and that question, of course, has to do with what Judge Diaz already pointed out earlier, and he was not allowed to repeat what he had repeated before on direct examination, trying to interpret what he thought Mr. Ramos meant when he told him that the Beast had carried away this young girl. And he answered by saying, well, I thought, over my objection, I thought what he meant was that he had killed her. That was the testimony that he gave the second time around. My argument is, in light of your observation, Judge Diaz, because I did not object the first time around, is, number one, this clearly exceeded my cross-examination. I was very careful not to ask Mr. Ramirez to give me his opinion about what he thought Mr. Ramos meant. I only asked him that one question, which I've now read to you. I didn't ask him any more questions about that conversation, and I did it purposefully because I did not want the government to have a shot at now going through this again and again, which is exactly what did happen, and I did not open that door. The government opened the door by recalling this man after they should not have had the right to do so. In a circumstantial case— But that's up to Judge Titus in the exercise of his discretion to make that call. Which, in this case, Your Honor, with all due respect, he abused. I understand, and so you contend he abused it. I do. By doing so. I do. The second person that we examined was Mr. Cruz. Mr. Cruz was a member of MS-13, and he was incarcerated in the Division of Correction in Maryland, quite frankly, with a lot of other MS-13 members. We learned during that trial that the Division of Correction likes to put gang members in the same areas so as to stop stabbings. MS-13 is over here, and BGF is over here, and so on. And so these guys had a cell phone or two while they were serving their time in the Division of Correction, and Mr. Cruz was allowed over objection to testify as to a conversation that he heard on a cell phone between a man named Proverso, an MS-13 member with whom he's serving time, and the victim, Ms. Martinez. He testified that what had happened was an investigation was going on by MS-13 inside the jail and outside of the jail to determine whether or not Ms. Martinez was or was not a Shavala, which meant, of course, according to the MS-13, that she would have to be killed. About 10 pages, I think, from pages 423 through about pages 433 of the joint appendix, he testified about the investigation that was going on. And the reason, of course, that that testimony existed was because part of the government's burden of proof is that if any overt act occurs by any member of MS-13, they must demonstrate that that act was motivated by some reason familiar with and important to MS-13 itself. That is for one to gain status, one to become a member, or whatever. And so it is an important element of the offense that the government has to prove. The reason that they wanted to ask Mr. Cruz what it was that he overheard Ms. Martinez say was because they wanted to use that as evidence to demonstrate that her murder was, in fact, MS-13 related, which is one of the elements of the offense. And in fact, she did say, according to Mr. Ramirez, on that phone call that he claims he overheard, that she was a member of a rival gang in Texas, that she had done some things for that gang, and as a result, she had moved to Maryland. When I objected, as this court now knows, of course, the government said, well, that was quite frankly only done not for the truth of the matter, rather it was simply done to see what the status of mind was of MS-13 members and what they did as a result of that conversation. That is error because what the court should have done was simply have asked or told the prosecutor, you can ask as a result of what you overheard, what, if anything, did you do or anybody else in MS-13 do? That is the proper way to handle that, not to allow Mr. Cruz to tell the jury what he overheard, which is an element of the offense. The response, of course, is, well, again, it was not meant for the truth of the thing. Well, of course it was. It was exactly why it was stated, because the government has to prove that the murder was MS-13 sponsored and related to an important element of the offense. But it doesn't have to prove that the victim who was killed was actually a member of a rival gang. It does not have to prove that, Your Honor, but what she said, though, provided them evidence. It provided direct evidence as to why they murdered her. It provided the motivation, but whether or not it was true doesn't seem relevant. That seems like classic evidence that's not hearsay evidence because it's being offered to see what the effect is on the listener. That, of course, is what the government argued and what Judge Titus found as well. And he gave a limiting instruction, right? Yes, and a limiting instruction, with all due respect, is a legal fiction oftentimes. It's the best we can do. That's right. But the proper thing to have happened here is not to have allowed that question to be asked and the answer to be given. What should have happened is the court should have instructed the government, all you should do is ask her as a result of whatever it is she said, what is it that you did or somebody else did? The court chose not to do that. That was an abuse of discretion, and that is not harmless error. The last person that I looked at was Mr. Perez Florian. And Mr. Florian, a very interesting witness, he had been dealing with serving time in a different jail with Mr. Ramos. And he had asked Mr. Ramos point blank, like these other witnesses did, none of whom could give an answer that Mr. Ramos admitted he did anything. But he asked Mr. Ramos, well, did you kill anybody? Did you kill this girl? And he said, and I quote, he didn't say yes or no, end quote. He then later on testified, this is around page 502 of the appendix. He says, quote, they brought her to a wooded area where we got her then, end quote. He then says at page 510 of the appendix, we got a sharp weapon and we stabbed her and cut her. On cross-examination at page 510 of the appendix, as a court might guess, I, of course, cross-examined him quite thoroughly on this matter. He repeated again that he was told by Mr. Ramos that she was stabbed and that she was cut. He also testified that Mr. Ramos told him that it was kind of too bad because she should have been placed in the water where she would have drowned and no one would have found her body. On redirect examination, the government asked, and I quote, this is from page 519, quote, you mentioned during cross-examination that you thought, the prosecutor said, that the girl had been stabbed. Did Mr. Mejia Ramos ever make any statements to you about firearms? Of course I objected. And after my objection was overruled, at page 521, Mr. Florian says, quote, he said it wasn't difficult to kill a person because you just needed one or two shots to the head and that was it. As it turned out, unfortunately, Ms. Martinez was shot one time in the head. Now, the government didn't like the answer that he gave on direct examination and the government didn't like the answer that they got on cross-examination, even though they interviewed this guy several times before he took the witness stand. And so they thought that a third try would be the charm. And, of course, it was. Now, the government responds in its papers that, well, what happened was after I objected to it, Judge Titus said, well, Mr. Mumau, just ask a, quote, nice non-leading question. And so what did he do? Well, he added the famous familiar words to all of us. He says, well, what if any discussion did Mr. Ramos have about firearms? At which time he responds by saying exactly what I already quoted. Now, the government in its brief says, well, you know, his response wasn't even directed about Ms. Martinez. It was kind of vague. And clearly it was not harmful because he didn't identify this was being directed at Ms. Martinez, which is to say it's disingenuous would be an understatement. The discussion was about the death of Ms. Martinez that he was having with Mr. Ramos. And this witness twice said that Mr. Ramos claimed she died by cutting and by being stabbed repeatedly. And the government, I don't care whether you call it leading or not, it was clearly an impermissible question to ask. The government, when you ask the question firearm, it's obvious that the government wanted him to say, oh. And that's exactly what he did. He said, oh, yeah, Mr. Ramos said all you got to do is shoot somebody once or twice in the head. And that's all that it takes. Your time has expired. And Your Honor, I apologize. Thank you so much. Oh, thank you. I was going to tell you, you can go into your rebuttal. But you want to wait for rebuttal. I shall. Thank you so much. Thank you. Good morning. Do I have any time left? Good morning. I'm Mary Davis, and I represent Mr. Mangivar. And the issue I'd like to address this morning is whether his due process rights were violated when the government failed to provide materials relevant to a polygraph examination of a key cooperating witness. As Judge King pointed out, oftentimes in MS-13 cases, there's a witness who comes in and gives all the history regarding MS-13 and also history of the particular case. In this case, the person who gave that testimony was Mr. Palma, also known as Maniaco. And Maniaco was the head of the CLIC in this case, which Mr. Mangivar allegedly belonged. And Mr. Palma gained this position because the predecessor was not interested in CLIC matters. But according to this witness, the only crimes he committed was two offenses. One was his involvement in one murder and his involvement in establishing rent, quote-unquote, for one person. But at the same time, he attributed numerous beatings and murders and other wrongdoings to Mr. Mangivar. During the testimony, there was a bench conference and there was a request for both psychologicals and polygraph information because it was determined that Mr. Palma was applying for the witness protection program. Did you know he'd taken a polygraph? We, at the time, the defense counsel believed he had taken a polygraph and there was a psychological. You didn't know he'd taken a polygraph? We knew he had taken a polygraph. That's what I asked. Oh, yes, yes. It was known. So you believed he took a polygraph. Right. I'm sorry. We knew he took a polygraph. He did take a polygraph. Did take a polygraph. Administered by the government. Exactly. Because that is required. What did you ask for? Asked for both the psychologicals and the polygraph. What did you ask for as to the polygraph? We asked for the polygraph test. We asked for the examination. I thought you asked whether you wanted to find out whether he was deceptive. You used the word deceptive. I think the request was for, the request was made two days prior to this actual bench conference where there was a request for both the psychologicals and the polygraph evidence. I thought you asked whether he was deceptive on the polygraph. Right, but there was a request two days prior for this information because it was known. Was there ever a written motion made? No, there was not a written motion made. Everything was on that bench conference. Exactly. And the court ever ruled? Excuse me? The court ruled? No, because the government made the representation. We have no knowledge. We don't have the records. We don't get that. And you didn't follow up? Right, there was no follow up because the government said it did not exist. That was the end of it. Exactly, that was the end of it. No, they didn't say that it didn't exist. They said that we don't get it. Right, we have no knowledge. And this witness program is the witness protection program? Exactly, Your Honor, yes. Did you say that that was operated by the Marshal Service or anything? No, no, it just said that Do you know who ran it? Do you know who's in charge of the witness protection program? I'm sorry, Your Honor, what? Did you know who was in charge of the witness protection program? I don't know who specifically was in charge of the witness protection program. It used to be the U.S. Marshal Service. I just said I don't know what program. I don't know. It was a government program. It is government, right. And, you know, in further research, further brief, it was, you know But you claim that's a Brady violation. We claim it's a Brady violation. But you don't know if there's anything in there favorable to you. Right, there's a very strong suspicion that there's something And even if it was lying or deceptive in the polygraph, it wouldn't be admissible. Well, there's the per se rule in this circuit that polygraph evidence is not admissible. However, Polygraph evidence, evidence of results of polygraph Results are not, right, exactly. Do you know anything about how polygraphs are operated or how they work? Did you all have anybody, an expert or anything? No, Your Honor, no. I mean, I think it's, I think it's, I would think it's fairly common knowledge That most people know how polygraph exams are done. And it wouldn't go just to deception. One of the things they do is they, or used to, when I was involved in it, They normally conduct a pre-test interview and a post-test interview. Exactly, Your Honor. And that's where you can find something. If you're a lawyer, it's what they say, not the results. But you never did ask for anything like that. Well, Because it's not one of the competing evidence in these pre-test and post-test interviews. But nothing was requested, either at the bench or any other time. There was a request prior to You didn't ask for that kind of information. You asked just for whether he was deceptive. No, there was Which is the result of the polygraph itself. There was a request Which is not admissible. Well, first off, there is a request prior to, two days prior to, For the government to release both the psychological and the polygraph exam. That was, and then it was further discussed at the bench. Now, I understand that this circuit has held that it's, you know, There's a per se rule against admissibility. But at the same time, in the case of U.S. v. Prince Oebo, Where it's stated that, at the very least, By reserving the reliability assessment to the district courts, Dalbert throws into doubt the viability of our per se rule. Well, but it also said that the witness's polygraph tests Are not admissible to bolster or undermine credibility. Correct, Your Honor. Yes, but at the same time, depending on what questions were asked, It's very possible that Mr. Palma said something That would have led to further investigation. Well, it has to be plausible, right? Not just possible. It has to be plausible. I think it's very plausible, but unless without seeing them But how is it plausible if the whole basis for the polygraph Was whether or not he was a suitable candidate For the witness protection program? That seemed to me to have nothing to do with the merits of the case. Well, Judge Dales, looking at the Justice manual policies Regarding the polygraph test for prisoners, They mentioned that that is, you know, A person can be kept out of the witness protection program If it looks like they're going to harm witnesses or use information. However, that manual, and nothing in there from what I could see, Restricts the polygraph solely to that issue. There could have been other questions. Right, so the question is, does that venture into the plausible Or just the possible? Without having seen it, it's kind of difficult to say. But you have to make a showing beforehand without seeing it. Right, but in this instance, we think it would be proper for this court To remand this case back to the district court So that at the very least, the district judge can make an in-camera review Of the polygraph, all the questions, what was said, And make a determination if there is anything, number one, Possibly that goes to the credibility, or possibly goes to, That could have led to further investigation. And at the same time, the defendant would be able to make an argument Regarding the reliability under Daubert. I think that the Prince Oebo case does not... You're still talking about the polygraph results. Well, but... I tried to give you a little help. What you need to get after was the statements. Jigsaw statements. The polygraph examiners sit down and interview The subject of the examination Before they put them on the box. And then they run the examination. And then they sit down and interview them again And say if they were... Particularly if they were deceptive. You could end up with two jigsaw statements In a polygraph examination. Unrelated to the results. You can think about that. I'll think about that. Okay, great. Thank you. Good morning, your honors, and may it please the court. Andrew Lang for the United States. Let me begin with Mr. Perrano-Ramirez's testimony. I think the record is clear in context That the district judge very reasonably exercised his discretion In permitting the prosecutor to essentially reopen, redirect And clarify this question that had been mistranslated. As the conversation at sidebar between the prosecutors and the judge Makes very clear in the transcript The translator apparently asked Why was Ms. Martinez killed Instead of asking by whom was Ms. Martinez killed. That produced the incongruous sort of bizarre answer Because she was a Chabala. And again, the district court I think was well within its discretion In allowing the prosecutor to try to ask that question again. And when he did, it produced an answer that was consistent With the question that he had asked. It produced the answer that the government wanted. Well, yes, your honor, that's why he asked the question. I don't dispute that. I do also want to touch on Judge Diaz's concern About the basis for Perrano-Ramirez's understanding That Mejia Ramos really was confessing to Martinez's murder. I do think that's clear from the context. As you mentioned, Judge King, this was a case with a lot of slang. A lot of nomenclature. And Perrano-Ramirez testified that members of MS-13 Routinely use the beast carried her away Or were doing the work of the devil To talk about things that they themselves were doing. So I do think the context makes clear why Perrano-Ramirez Understood what he testified that he understood About what Mejia Ramos was confessing to him. Was he asked about that? Was there a foundation set? I believe there was, your honor. I don't know that he was directly asked a question like And why did you understand him to be saying that he had killed her? But there were a series of questions about What do people mean when they say things like The beast carried her away? And what do members of MS-13 Or the beast or the devil do with respect to Chavales? So I think that makes clear why he believed That Mejia Ramos was saying he had in fact killed her himself. Unless there are other questions about Perrano-Ramirez Let me briefly address Dimas Cruz's testimony. Mr. Cruz related this conversation in which Ms. Martinez said that she was a member of SU-13 But clearly that statement wasn't admitted for its truth. And indeed the truth, the objective truth Of whether Martinez was in fact a member of SU-13 Wasn't really relevant to the government's theory of the case Or the reason that the question was being asked. The reason that her stated membership in SU-13 mattered at all Was because it gave members of MS-13 Including Cruz and Mejia Ramos A reason to, shall we say, investigate Martinez Or be suspicious of Martinez and think that she was a Chavala. And in fact, Cruz's testimony included other reasons That MS-13 was suspicious of her already Namely the clown tattoo Which apparently indicated membership in a non-MS-13 gang. And of course there's the very explicit Very sweeping limiting instruction that the district judge offered Before the statement was even offered into evidence That the jury could not consider it for its truth. Your colleague on the other side said That there's a much more innocuous way to have done that Without injecting this kind of prejudicial information Into the record. I mean, would that have the same effect The way he described asking questions? Well, a couple of responses to that suggestion. I think first it would have been At best confusing to the jury to ask a question like What did you do in response to whatever she said? I think it would have left a sort of lacuna In the jury's understanding of the sequence of events. And I think the way that the evidence actually came in Was much clearer and easier for the jury to understand And it wouldn't have left that kind of implicit question What could Ms. Martinez possibly have said? Which might arguably have even been more prejudicial. And that said, I think clearly this statement Was not admitted for its truth. Its truth didn't objectively really matter Because it didn't matter whether she was in fact Objectively a member of SU-13. And again, the limiting instruction was very, very clear and explicit. Turning now to the question about firearms Asked to Mr. Perez-Florian This question was simply not leading. It introduced a new topic of conversation But it wasn't a leading question In the sense that it suggested its own answer Or the tenor of the desired reply. What, if anything, did Mr. Mejia-Ramos say to you about firearms Was an innocuous, non-leading question. And moreover, with respect to harnessing The if-anything saves it from being leading? I'm not sure it would be leading even without the if-anything. I think it's a fair practice on redirect examination To ask an open-ended question like What did this person say to you about this topic? Otherwise, there's really no way to introduce A new topic of examination Without it coming from the person asking the question. That said, I think the response In the context of Perez-Florian's testimony Was unquestionably harmless Because there was no connection to the rest of his testimony It didn't change his testimony About how he understood Ms. Martinez to have been killed Which, of course, was inconsistent with how she was, in fact, killed. So even if it had been a leading question And even if the judge had abused His very broad Rule 611 discretion In allowing the prosecutor to ask that question It's unclear how the answer to the question Caused any kind of prejudice. Let me also address the Brady issue. The fundamental problem with the Brady argument With respect to the polygraph examination Is that it's speculative. It relies on an assertion that Not only did the polygraph take place But that there's some reasonable probability That it produced material exculpatory evidence. And that's belied by Department of Policy. There's no indication that that happened. Department of Policy can't change the Brady obligation. You all can write all the policies you want down there Brady's based on the Constitution. Absolutely, Your Honor. And I wasn't suggesting that Department of Policy What Department of Justice policy got to do with it? So with respect to the If you had an obligation to turn something over under Brady You have to turn it over under Brady. Absolutely, Your Honor. The Department of Policy that we discussed in our brief Is only relevant because it illuminates What the polygraph is actually for In the context of the witness security program. The polygraph results Whether it's deceptive or not Is not admissible anyway. But it creates jigsaw material Which are potentially impeaching And you probably, I would say, turned over prior statements. Some of them. And you said this is all the jigsaw. They have it all. And if you gave them a polygraph examination You have some more. A couple of responses. It was interviewed in connection with the polygraph examination. Isn't that correct? A couple of responses, Your Honor. That's a leading question. Fair enough. Isn't that correct? I hesitate to say yes. Do you know anything about polygraphs? I'm the furthest thing from an expert in how polygraphs are administered. Well, you should have found out something about them I did with respect to the witness security program. And they interview the witness. And then they run a polygraph. And then they interview the witness again. Particularly challenging him on the issues where he was presented. And it creates jigsaw material. It could. And if it does, you have an obligation under Section 3500 to turn it over. So let me offer a couple of responses to those questions. Isn't that correct? If there had been jigsaw material, then yes. Maybe they didn't ask for it. Maybe they didn't ask for it right. But I don't know about that. But they probably asked for jigsaw material. So a couple of responses. The most important response that I want to offer is the polygraph is not about the person's general character for truthfulness, nor is it about the facts of the case in which they're going to testify. Before you get too far down that road, let me just ask you a procedural question. Do you think this claim was preserved in the district court? I don't, Judge Diaz. And the reason is there was never any application or request made to the district court at all. And that's where all this should have been hashed out. And there's no district court ruling. I couldn't agree with Your Honors more. The only reason that this is in the transcript at all is because of what one might call a sidebar within a sidebar. They're up at sidebar discussing the conditions of confinement that Ariel LaPalma can expect. And during that conversation, there's a side discussion between defense counsel and the prosecutor that's interrupted multiple times by the district judge. And that conversation never is even commented upon by the district judge. There's never any kind of request made or motion made to the district court of any kind. Well, didn't they make a motion for all Rule 16 material and Brady material and jigsaw material of the government? So, yes. And you have the obligation probably whether they ask for it or not. Absolutely. Of course, we have the obligation regardless of whether there's a request made. But the issue is here on appeal. And you say you didn't get anything that the government created if it ran a polygraph examination. I'm just saying I know, and maybe I'm objecting too much to my personal experience, that they create interview material. That can be jigsaw material. So, you don't know anything about that. And you didn't turn it over. So, I do know. But maybe they didn't preserve it. But I think you have an obligation anyway under Rule 16. So, first of all, they absolutely didn't preserve this issue. The lens is plain error. Second of all, they didn't make a motion for Rule 16 material. Correct. Or Brady material. They didn't make a motion. No, I'm not saying that they didn't make a general. Yeah. They make all those motions right at the outset. But they never made any kind of. They got four motions that ask you to turn over what you're obliged to turn over under the statute. Yes, and we have a general discovery of. And under the Constitution. Absolutely, we do. And we complied with that obligation. There was never any violation of Brady. But you don't know whether these others exist. So, I do. And you had an obligation to find out because they were created by the government, by the Department of Justice. Yes. That would be the point that would be the best argument for them to make, I think. And as I represent in our brief, as we've been consistently representing, there has never been a violation of our discovery obligations in this case. But you haven't yet tried to find whether there's any interview reports in connection with the polygraph examination. So, I take issue with that on a couple of levels. So, first, Your Honor, the request that was made was for polygraph results that might indicate deception. I know about the – and I brought that up. They want to know whether he was deceptive. I'm talking about a request at the beginning of the case for statements of the defendant, of the witness. Statements of the witness. That's what 3500 material is. Yes. And if the government creates them, I thought the prosecutors were obliged to get a hold of them and turn them over under Brady. Under the Jinx Act, in particular under Brady, if they possibly impeach him. So, there is no possibility here that they were impeaching, number one, because they would have been – You don't know. You haven't seen them. So, with respect to the actual report of the polygraph, I have seen that document. There is no possibility that that result would have been material exculpatory evidence under Brady. How about the independent of the result? So, first of all, that's not the request that's been made. It's not the argument that defense counsel was making here on appeal. Second of all, even if there were associated interview reports, it's not clear to me how those would be Jinx material if they're not connected to the subject matter of Ariola Palma's testimony. His testimony on direct was all about MS-13, what he knew about the defendants, what their conduct was, and to the extent that the polygraph and whatever associated interviews was designed with a very narrow purpose of determining whether a person is going to harm another participant in witness security or disclose the identity of another participant or disclose information obtained from another participant in witness security. That has no relationship at all. If he was sent up to get into witness security from the very beginning, what if he had said something outrageous and maybe not so outrageous? I'll say anything I have to say at trial to get into this witness security program. True or not? So, I believe the fact of his being a witness security program candidate was known to defense counsel, and I think that's actually clear from the record. So, whatever sort of fruits of cross-examination they might have gotten from that avenue of questioning were all available to them to the extent there might be a sort of giglio connection to that fact. I don't know that perhaps if he had said something outrageous in the process of the witness security application, at least in an abundance of caution, that might have been disclosed. So, that might be possible, but it's not necessarily plausible, which is the burden, right? That's exactly right, and I think that's the avenue that I've been sort of taking. I think if there were conceivably any material, one would have to perform some great leaps of speculative inference upon inference to conclude that there's any reasonable probability that that information exists, particularly in light of, as reflected in department policy, the very, very narrow purpose of the polygraph examination. I also do want to point out, and I think defense counsel has acknowledged this, at least implicitly in her reply brief, that there has no longer really been any discussion of the psychological evaluation. That's the primary focus of their opening brief, and I do want to make clear for the court that, as reflected in department policy, that more detailed evaluation wouldn't have taken place because it typically doesn't take place until release is imminent, and as the record here makes clear, Arreola-Palmo was actually still pending sentencing at the time of trial. Unless there are any questions about these issues or about Mr. Romero-Castro's testimony under Rule 403, I thank you all, and I ask you to affirm. Thank you. Very short rebuttal, if any. Your Honor, as to Florian, the government is just flat-out wrong. He, when it says there was no prejudice, when he added the words, what, if any, things did Mr. Ramos say about a firearm, it was clearly directed at the death of Ms. Martinez, and the government never should have had a third strike to get him to say something that they couldn't get him to say once and twice, and that is so prejudicial it's hard for me to really overstate it. Thank you very much. Very short rebuttal from you two. Yes, Judge, very short. In answer to Judge King's question, it was requested whether there are any deceptive answers given, and I think that in order to respond to that, the government necessarily would have to include both the pre- and post-questioning that took place immediately prior and immediately after the polygraph. Also, I would like to point out that it is the practice in the district courts in Maryland that the defense attorneys sign a discovery agreement, and in those discovery agreements, the government promises to turn over all Jenks and Brady materials, and that is part of an agreement that is signed by both the government and the defense. And finally, I would just say that I don't, I would ask the court not to consider the government's representations now, what was actually in the polygraph examination. At the time of trial, there was representations made. They don't have them, and I think that is what this court needs to focus on is what happened at trial and not what the government is trying to interject at this point in time. Thank you very much. We understand, Ms. Davis, that you are doing this pro bono. We thank you very much for your help, and we understand that you're court-appointed. We thank you. We'll come down and, do you want to take a break? We'll come down and greet the lawyers, and then we'll take a brief recess. This Honorable Court will take a brief recess.
judges: Diana Gribbon Motz, Robert B. King, Albert Diaz